Supporting Society Training All rise. The United States Court of Appeals for the Federal Circuit is now open for discussion. God save the United States and the Honorable Court. Please be seated, ladies and gentlemen. Good morning. We have a full morning of business, but before we attend to that, we have a family event. A pleasant family event. And that is the admission of one of our law clerks to the bar of this court. And for that, I would like to ask Judge Rayner to make a motion. Judge Lori, Judge Toronto, I move for the admission of Colin D. Swan, who is a member of the bar and is in good standing with the highest court in Virginia. I have knowledge of his credentials, and I'm satisfied that he possesses the necessary qualifications. Colin, it seems that it's only yesterday that you joined my chambers, and I suppose that a year is a short time. During your work as my clerk, I've time again been impressed by your work ethic and your legal acumen. Your excellent work product is the fruit of those two attributes, and as a result, your work here has not only benefited me, my chambers, but the entire court. Standing before me is a man that is an excellent lawyer and a teacher of the law. And I wish you the best in the future, Colin. Thank you, Judge Rayner. I need to consult with my colleague, Judge Toronto, who has consented. Because Mr. Swan is on a different floor, we don't see you all the time. But I have great confidence in the judgment of Judge Rayner, and I know the quality of the work coming out of Rayner Chambers. So we grant the motion and ask you to step forward and take the oath in the circuit executive. I'm going to just write again. Do you solemnly swear that you will conform yourself to the terms and conditions of this court, uprightly, according to the law, that you will support the Constitution of the United States of America? I do. Congratulations, Mr. Swan. Congratulations, Mr. Swan. We have six cases on the calendar this morning. One from the Armed Services Board of Contract Appeals. Two from the Court of Federal Claims. A patent case from the District Court. And two government employee cases which are being submitted only in the briefs and will not be orally argued. Our first case is American Aquasource versus the Secretary of the Army, 2014, 1083, Ms. Monti. Monti. Monti, yes. Thank you. May it please the Court. Thank you very much. Good morning. American Aquasource was unable to meet its initial obligation to have a minimum inventory of bottled water in place by the contract date of August 1, 2008, primarily because of the breach of contract by the Army. The Army failed to supply necessary land at the inception of the contract agreement for the bottling plant to be constructed and for inventory to be taken in place. But there were, what was it, six acres provided? And didn't your client indicate that six acres would have been sufficient? Later they did. At the inception of the contract, there were no specifications in the contract for how much land was available. There was a site visit, but only two of the 19 offerors attended that site visit. It was scheduled for four days after the initial announcement was made. And to get to Iraq was difficult. So I heard you correctly that the contract did not contain specific provisions as to the amount of land that was to be provided. That's correct. How then was there a breach? Well, here's what happened then. Because no one attended the site visit, the Army put out what they called their conceptual plan, which was a sketch that you would find in the joint appendix on JA88. The sketch comprised of two different areas, a truckloading area and a building plant that was about 11 acres. My client had been involved in six other plants up to that point, all of which ranged from 8 to 14 acres. In addition, the two distinct areas on the sketch coordinated with the requirements under the contract that you have both a bottling plant and a water storage yard. So the assumption was they were providing the sketch to be relied on. There was no other indication of any other dimensions. And as you see in joint appendix 145, the design that American Aquasource used was based on that 11 acres. None of the other 19 offers asked for any other clarification as well. So in order to make this… Is it your position that the bottling plant, as envisioned under the agreement, that that was going to be built and in production prior to the August 1st date? No, sir. So there's no relationship then between the actual bottling plant and when it was going to be established and the obligation of your client to provide water by August 1st. That's true. It had nothing to do with the construction. In fact, the contract anticipated that it would not be. What's the basis of your argument then that the failure to have provided the 11 acres versus a six was a breach related to the provision of the water? Okay, well, in order to take the minimum bottled inventory, there was always an assumption that we would be purchasing from outside vendors and bring it in. But you had to have the land. And when the initial dimensions came down and there were only six acres, it took an entire redesign of the plant. The amount of water that it takes in order to meet that million cases of inventory takes a large amount of land. And they had initially planned on it being pallets on the ground. The redesign meant that they had to put pallet racking so that they would have… It was never understood, though, that the first shipping of water due August 1st was going to be actually produced on that land. It was never going to be produced. But it had to be secured on the land and handled in the inventory requirements according to the contract. So there was never an ability to… The board kept talking about purchasing. You could purchase the water, but you couldn't take delivery and have the minimum quantities of million cases on hand until you had the land and the land secured. Because the inventory requirements require secured from tampering and people in place. So the whole disagreement or concern over whether there were six acres or 11 acres and the ability for American Aquasource to actually do this plan with six acres didn't get resolved until after the August 1st delivery date had passed. Can I ask you that? Yeah. It sounds like you're saying that even though the contract by its terms said nothing more than the Army, the government, will provide land. Correct. That there was then some subsequent… I don't know quite what to call it. Representation? Yes. Of an amount of land that then led you to design in way number one. And when that became clear it was misleading or different from what could be provided, you had to redesign. What's the contract doctrine that this narrative of a representation that turned out to lead you down a bad path fits into? Well, I believe that it created an ambiguity in the contract that should be construed against the Army. Because what happened was this was put out there to rely on. All 19 of the offerors took this in account and there was never any other discussion as to the amount of land. There were no representations that this drawing and the dimensions that were provided were not to be relied on. In fact, you have to have assumed that they are going to be providing it for some purpose. And the purpose was because no one could get to the site visit. And so you were supposed to know what your area were. They never at any point, although the Army does say that they measured the land, at no point in time did they ever put out any dimensions other than this one gap. That just didn't remind me, what's the acreage on the portion of the drawing that was supposed to be the storage site as opposed to the bottom? The additional point was 4 to 5 acres. It was approximately 11 acres for the entire track. So the drawing suggested 4 to 5 acres for the storage of water. You agree that 6 was enough. We only agreed that 6 was enough after extensive redesign, which put us past the date that the initial inventory would have been in place. My client, all the way up until the termination of the contract, was working with the Army to work through not only the land but the issue on housing. At every point in time, all the way up until the termination occurred, my client thought they were working through this and going to have a new plan. A new agreement. So after my client had redesigned it and accepted the land, they were proceeding diligently through the contract. It was only after the housing dispute came up, which is a whole different area, that the Army asked for a release of all claims and a no-cost settlement as a part of the renegotiation and then terminated this. But it all started with the issue of the land. And then once we'd gotten past that, then it became clear that they did not have housing available for the contractor personnel as well. So you had a dispute about the land and the housing, and I fully understand that. But it was intended from the very beginning that your client was going to purchase water and not produce water. Correct. So I still fail to see any clear answer to my original question. What's the connection here? I'm so sorry. We had to have the actual land, whether it be six acres or 11 acres, the land had to be agreed upon and delivered to my client so that they could take delivery of the water they were going to purchase. But your client never did purchase the water. They didn't purchase the water because they had already passed that time period. At the time, and all of these things were a part of the ongoing negotiations, the Army had an outside contract. They were purchasing water from another source that was going through October. So there was never this whole discussion. In fact, my client was under the impression the Army had waived that initial delivery date until it already went back to that point because of these ongoing issues. But it all started with the fact that the Army had provided my client with a basis to reasonably believe there was an 11-acre tract. And so once that had occurred and that that was the issue, it was after the date had already passed before it became clear that six acres was all they were going to get and my client redesigned. But he still would have had to have the land in place to take delivery of the minimum bottled water that he would have had to purchase from an outside source. Never a question as to whether or not they could purchase from an outside source. Only once you purchased it, what were you going to do with it? And the only thing that you could do with it was put it on the land and they had not accepted the land until after that delivery date had already passed. And then we came to the issue of whether or not there were housing. And I think that everyone has agreed that the housing dispute was clearly an ambiguity and the Army then offered to modify the contract for that. But it additionally was a problem. Thank you. We'll save the remainder of your time for rebuttal. Mr. Mager. Thank you, Your Honor. May it please the Court. In addition to building a water bottling plant, the contract provided that American Aquasource was to have a plant water storage yard. That is a storage lay-down area to quarantine water for a 48-hour period required for testing before being released. That land was approximately to hold 150 to 300 cases of bottled water. There was, however, no requirement in the contract that they maintain a Class I storage yard for bottled water. So to the extent they assert here today that they could not receive delivery of the water because they did not have land or an adequate amount of land, that's contrary to the contract. That's contrary and inconsistent with the design of the storage lay-down yard as provided in the contract. And it's also contrary to the conference call notes, which were attached to solicitation, in which an offeror asked, will they be required to maintain a storage yard? And the government answered quite clearly, no, joint appendix 55. I'm confused about something. Are you saying that you required a million cases but did not provide in the contract land that was adequate to store a million cases? No, I'm saying that the contract requirement for storage was only 150 to 300,000 cases. You required that a million cases be available. A million cases were to be available, and that's because you weren't going to be storing the water. The initial delivery was going to be a million cases. If you had a bottling water plant up and going, you would have a 48-hour quarantine. There's a million cases that are going to come indisputably before there's a bottling plant. Where are they going to put them? The class one storage yard, which is where you store water. So you just said that that was well short of sufficient for a million cases. No, no, no. The plant water storage yard, the requirement was 150 to 300 cases. The contract doesn't provide for them storing the water other than the 48-hour quarantine period when the water would come out of the plant. The initial delivery was coming from a separate source, so instead of going on the land that they were provided, it would go straight into the class one storage yard because it's going straight into storage. It's not being produced at the plant. We don't need to test it because it's not water that has come out from another CENTCOM-approved water source. They were supposed to arrange to lease land to store the million cases? No, as provided in the conference call notes, that storage yard was being run by KVR, subject to another contract. KVR, it's another government contractor. So there was someone else who was running the storage plant. So they would, assuming that they had shown up on August 1st with a million cases of water or did so on a rolling basis, that water would come in, the government would have it, and it would put it in the class one storage yard. It wouldn't go on the six acres. It wouldn't need to go on the six acres at any point. So if they, say, had begun construction, they had done something else with the land during that time period, they would have absolutely been fine. We don't know whether or not, you know, they would store. I mean, they've talked about redesign. We haven't seen, and at the board, we never saw any redesign of their facility to accommodate water. We don't know if, as they redesigned it, they designed it to store a million cases or more. Their initial design had called for actually 759 cases of, thousand cases of water being stored on the land, which was, again, different from the contract requirements, but that was never produced to the government. It was produced at the Armed Services Board of Contract Appeals. In any event, it's the government's position that the failure to deliver the water was a prima facie cause for termination for cause of the contract. But there were issues of housing? There were some issues about that. The issue of names for clearance? Yes, I mean, they failed to submit any names for clearance, and the Armed Services Board of Contract Appeals found that the proximate cause of the failure to, or of their failure to deliver, or of the failure to have the names provided. There was a dispute over housing, exactly what was to be provided. The contract provides that we provide housing as available, or certain services as available. There's a question of what is as available. Does it matter who that contract employee was? The government had offered to modify the contract, and in fact, the only individuals who were looking at coming out, the government actually scrambled over a one-day period after getting notice that they were planning on having some individuals come out, and managed to find tents and space for them out on contractor's row. So the government did try to find housing for those that were planning on coming out, but we never got their names, and they never showed up. But we do agree that there was a definite ambiguity in the contract with regards to exactly what sort of housing to be provided. But that's why it would fall normally within a dispute clause. That's something where the contractor is charged with trying to proceed while we work out these kinds of disputes. Unless there are any further questions? Apparently not. Ms. Montee has some referral forms. Thank you. Thank you. As for the Class 1 storage yard, I just want to make a couple of points clear. There is a requirement in the actual contract for the contractor to have not only the area that is the quarantine, but the handling of the inventory, and all of the contract materials say that, in addition to everyone has agreed, that the American Aquasource was supposed to take possession of a million cases of water and handle that. And all through the contract, it talks about that. The conference call notes that Mr. Mager is referring to were notes not with the offerors. This was February of 2008. Prior to even putting out the bid where they talked about will they have a storage yard or will they not, almost everything in that conference call changed in addition to the fact that during that conference call, they had provided for the Army to pay in advance in three-month increments, and the contract eventually got changed so that all the burden of additional costs were on the actual contractor. So nothing that happened in that conference call went forward. So in addition to the storage yard, you had to have an inventory handling, and that's where this whole dispute comes about. So in the actual statement of work, it says that the contractor is going to produce, stage, store, and issue the palletized cases of the purified water. What are you reading from? I am reading from 1.4 on JA44, the general information on the water plant. Additionally, when it goes into the storage yard, the 300 cases is purely for quarantine, but it always contemplates that the contractor would have to be handling the inventory. On the issue of housing, although Mr. Mager has said that the board found that the approximate cause of the issue was failure to vet, that's not exactly how it turned out. They said that it didn't matter that the Army had breached the contract on housing because American Aquasource had not vetted their workers. But the reason that they had not vetted their workers was because there was no timeline in place for where there would be any kind of housing, and it was a pool of potential workers that we couldn't know who the actual workers were going to be from the local Iraqi workers until we had a time frame. We worked through a contractor who was putting together the workers. So no names had been vetted until a timeline was put in place for housing, and there was never a timeline for housing. It was very clear that the Army did not contemplate having local workers, although a part of the contract was the contractor was required to set up hiring practices for local workers. So in addition to this whole issue of land, American Aquasource was never able to bring in the contractors or even bring in people to do the handling of the inventory. Our position on all of this is that the Army should have continued to work with American Aquasource rather than terminating this for a default of something that had occurred and that everyone had proceeded a month and a half beyond that point. And because of that, because of the different disputes that arose and the Army insistence that a part of renegotiating was for American Aquasource to sign a no-cause settlement agreement where they waived any potential claims, even though all of these things cost them time and money and the government was not on any kind of payment schedule, that this contract should have been, that this default should be turned into a termination for convenience. Thank you. Thank you. Ms. Monte, we'll take the case under advisement.